**L.I. HEAD START CHILD DEVELOPMENT SERVICES, INC., Anthony Macaluso and Paul Adams, Individually on their own behalf and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**John L. KEARSE and Alphonso Anderson, as Trustees of the Community Action Agencies Insurance Group, and Community Actions Agencies Insurance Group, Defendant.**

No. CV 93–1443 ADS.

United States District Court,
E.D. New York.

May 15, 2000.

Altieri, Kushner, Miuccio & Frind, P.C., New York City (Alexander A. Miuccio, Barry L. Mendelson, of counsel), for the plaintiffs.

Frank & Breslow, L.L.P, Farmingdale, N.Y. (Allen B. Breslow, Ralph A. Somma, of counsel), for the defendants.

### ORDER

SPATT, District Judge.

### I. BACKGROUND

After a non-jury trial on January 26, 27 and 28, February 12 and 19, April 9 and 30, and September 17, 1999, the Court, on March 3, 2000, held that "[t]he provisions of the applicable ERISA statute, 29 U.S.C. §§ 1103(c)(1) and 1104(a)(1)(A) require the defendants to return to Head Start the sum of $497,736, the portion of surplus reserves segregated for and attributable to them," *L.I. Head Start Child Development Services Inc. v. Kearse,* 86 F.Supp.2d 143, 153 (E.D.N.Y.2000).

Presently before the Court are three motions. First, the defendants move pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") for an order granting reconsideration of the Court's March 3, 2000 decision insofar as the defendants claim that the Court overlooked the financial stability of CAAIG. Second, the plaintiffs move pursuant to Fed. R.Civ.P. 59 for an order granting reconsideration of that portion of the Court's March 3, 2000 decision denying prejudgment interest to the plaintiffs from September 1, 1992. Finally, the plaintiffs move for an award of attorneys' fees and costs.

## II. DISCUSSION

### A. *Standard of Review: Motion For Reconsideration*

Motions for reargument are governed by Rule 6.3 (formerly Rule 3[j]) of the Local Rules of the United States Courts for the Southern and Eastern Districts of New York. Local Rule 6.3 provides as follows:

A notice of motion for reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion. There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. No oral argument shall be heard unless the court grants the motion and specifically directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court.

■ The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transportation, Inc.,* 70 F.3d 255, 256–57 (2d Cir.1995) (citations omitted). The high burden imposed on the moving party has been established "in order to dissuade repetitive arguments on issues that have already been considered fully by the Court." (*Ruiz v. Commissioner of the D.O.T. of*

*City of New York*, 687 F.Supp. 888, 890 [S.D.N.Y.1988], *modified on other grounds*, 934 F.2d 450 [2d Cir.1991]). Granting such a motion means that a Court must find that it overlooked "matters or controlling decisions" which, if it had considered such issues, "would have mandated a different result." *Durant v. Traditional Investments, Ltd.*, 88 CV 9048, 1990 WL 269854 (S.D.N.Y. April 25, 1990).

## 1. The Defendants' Motion for Reconsideration

■ The defendants move for reconsideration of the Court's prior order holding that "the record does not demonstrate that a transfer of $497,736, representing Head Start reserve funds, would threaten the financial well being of the CAAIG Trust." The defendants submit that the Court overlooked Defendants' Exhibit U which demonstrated that the net assets available for benefits in the CAAIG Fund for the year ended August 31, 1997 were $335,298. As a result, the defendants argue that execution of the Court's order will cause the CAAIG Fund to transfer all remaining assets to the detriment of the remaining CAAIG Fund participants.

Another review of the Court's prior order and the record leads the Court to the view that the defendants' motion for reconsideration should be denied.

The defendants rely upon the Second Circuit's decision in *Ganton Technologies, Inc. v. National Industrial Group Pension Plan*, 76 F.3d 462 (2d Cir.1996). First, it is not clear that the rationale in the *Ganton* case mandates that the issue as to whether the CAAIG Fund has the financial stability to pay the judgment in this matter is a crucial element in this case. As mentioned in the Court's prior order, the *Ganton* case involved a pension fund rather than a health benefit fund. This distinction was noted by the Second Circuit in *Trapani v. Consolidated Edison Employees' Mut. Aid Soc'y, Inc.*, 891 F.2d 48 (2d Cir.1989). In a pension plan, the Court has the critical policy consideration of pro-

tecting the future long range actuarial projections of its members. Pension fund members plan their retirement and future financial well-being on the proceeds of a pension. With regard to a health benefit fund, members of the plan have only unvested future interests that may arise if health benefits become necessary. In addition, while it would undoubtedly pose a financial burden, remaining members of a health benefit fund can always purchase other health insurance if the fund becomes depleted.

Second, the *Ganton* case involved a pooled pension fund. Here, by contrast, the Court has previously determined that the "CAAIG was not a pooled fund and that each of the contributing employer's funds were segregated." This is an important distinction because unlike the remaining employees in *Ganton*, the remaining employees of the CAAIG Fund, have no interest or right to the L.I. Head Start reserves. In other words, unlike *Ganton*, the plaintiffs in this case are only seeking the return of their segregated contributions paid on their behalf, not expended for benefits, and retained by the defendants for the benefit of other groups that have nothing to do with these separate contributions. As such, the Court has serious doubts as to the applicability of the *Ganton* rationale.

Third, even if the Court were to find that *Ganton* applied and mandated a finding that the Court determine the financial stability of the CAAIG Fund, the Court finds that if this issue is relevant, there is no evidence in the record demonstrating the present financial condition of the fund. The defendants reliance on Exhibit U is misplaced. Exhibit U dates back three years and does not reflect on the present condition of the Fund. More importantly, the Court is of the view that the present financial stability of CAAIG is not relevant as public policy considerations suggest that the more appropriate date to focus on is September 1, 1992—the date that L.I. Head Start withdrew from the Fund and

was entitled to the return of its reserve funds.

To preclude a return of the reserve funds left in CAAIG in 1992 because of the possibility that the CAAIG Fund, as it presently stands, may not have the financial ability to repay the funds, would essentially reward the defendants for the misuse of the segregated funds for the past eight years. The Court agrees with the plaintiffs that "[t]he departing employees would suffer a gross injustice if the trustees are adjudged by this Court to be guilty of violating ERISA's 'Exclusive Benefits' rule, but are relieved of the transfer Order simply because the trustees wrongfully spent the reserves belonging to the departing employees of L.I. Head Start and, consequently, cannot comply with the Order." In other words, if the Court were to take into account the defendants present financial condition, it would send an inappropriate message that when faced with a request for funds from a segregated participant of a health benefit fund, when there is depletion of the fund assets the fund can claim financial instability as a defense to the return of the segregated funds. Surely, public policy considerations mandate avoidance of this type of behavior. Thus, the Court finds that if the *Ganton* rationale applied, the appropriate date to examine the financial stability of CAAIG would be September 1, 1992 and not the date of the Court's order or an arbitrary date such as the date proposed by the defendants. *See* Exhibit U.

For these reasons, the Court denies the defendants' motion for reconsideration of the Court's prior order and finds that it did not overlook the financial well being of CAAIG.

### 2. The Plaintiffs' Motion for Reconsideration

■ The plaintiffs seek reconsideration of that portion of the Court's March 3, 2000 Order which denied to the plaintiffs prejudgment interest on the sum of $497,-736. The plaintiffs contend that the Court overlooked the contents of the amended complaint and the applicable law relating to prejudgment interest in ERISA cases. The Court's prior decision stated "as the plaintiffs' complaint does not request prejudgment interest and because the $497,-736 figure consists of $156,916 in interest earned by CAAIG allocable to Head Start, the Court will not address that issue."

The Court finds that it overlooked the second paragraph of the plaintiffs' amended complaint which seeks, in relevant part, a judgment "[o]rdering defendants to transfer the assets and reserves, plus interest thereon...." While the amended complaint did not specify whether it was seeking prejudgment or post-judgment interest, the Court finds that because post-judgment interest is statutorily mandated and added to the judgment whether or not ordered by the District Court, *see* 28 U.S.C. § 1961, it can be implied that the amended complaint addresses the issue of prejudgment interest. As such, the Court grants the plaintiffs' motion for reconsideration of the issue as to whether prejudgment interest should be awarded in this case.

■ The issue of whether to award prejudgment interest in an ERISA case is left to the sound discretion of the district court. *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 286 (2d Cir. 1992). The defendants argue that if the Court were to grant prejudgment interest it would further injure the plan participants to the unwarranted benefit of the plaintiffs. The defendants assert that the record demonstrates that an award of prejudgment interest coupled with the amount of the award, is far greater than the assets of the CAAIG Fund. In support of this proposition, the defendants rely again on Defendants' Exhibit U, admitted into evidence on April 9, 1999 which demonstrates that the CAAIG Fund's net assets available for benefits for the year ending August 31, 1997 was $335,298.

■ The Court is of the view that an award of prejudgment interest to the plaintiffs during the period the defendants have had use of the funds, namely September 1, 1992 to date, would be "fair, equitable and necessary to compensate the wronged party fully." *See Mendez v. Teachers Ins. & Annuity Ass'n,* 982 F.2d 783 (2d Cir.1992) (citation omitted). The only question, therefore, is whether the transfer would "threaten the financial well being of the Plan to the detriment of the remaining employees." *See Ganton Technologies, Inc. v. National Industrial Group Pension Plan,* 76 F.3d 462 (2d Cir. 1996).

For the same reasons as stated in the Court's analysis of the defendants' motion for reconsideration, the Court finds that it would not be appropriate for the Court to deny the award of prejudgment interest to the plaintiffs due to the purported instability of CAAIG. As previously stated, there is no evidence in the record indicating the present financial status of CAAIG. In addition, if the Court were to deny the award of prejudgment interest to the plaintiffs, it would essentially be rewarding the defendants for the depletion of the segregated assets of the plaintiffs that were requested in 1992. As such, the Court grants the plaintiffs' motion for reconsideration and directs that the defendants return to Head Start the sum of $497,736 plus prejudgment interest from September 1, 1992, to be calculated by the Clerk of the Court using the United States Treasury Bill Rate.

### 3. The Plaintiffs' Motion for Attorneys' Fees and Costs

■ Finally, the Court will consider the plaintiffs' request for attorneys' fees and costs. The award of attorneys' fees under ERISA is committed to the discretion of the trial court. *See Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 872 (2d Cir.1987), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990); *Pagovich v. Moskow-*

*itz,* 865 F.Supp. 130, 139 (S.D.N.Y.1994). The Court's discretion is guided by five factors:

1. The degree of the offending party's culpability or bad faith;

2. The ability of the offending party to satisfy an award of attorneys' fees;

3. Whether an award of attorneys' fees would deter other persons from acting similarly under like circumstances;

4. The relative merits of the parties' positions; and

5. Whether the action conferred a common benefit on a group of pension plan participants.

*Chambless,* 815 F.2d at 871 (citations omitted); *Scalamandre v. Oxford Health Plans (N.Y.), Inc.,* 823 F.Supp. 1050, 1064 (E.D.N.Y.1993). "No one of the five factors is necessarily decisive, and some may not even be appropriate in a given case, but together they comprise 'the nuclei of concerns that a court should address in applying [§ 1132(g)].'" *Scalamandre,* 823 F.Supp. at 1065, (*quoting, Greenblatt v. Prescription Plan Servs. Corp.,* 783 F.Supp. 814, 828 (S.D.N.Y.1992)).

■ Applying these standards, in the exercise of its discretion, the Court will award attorneys' fees to the plaintiffs. Due to the incredible testimony of John L. Kearse and Charlotte Singer, the notary public, and the Court's prior finding with regard to the questionable October 6, 1983 document, the Court is of the view that the defendants acted in bad faith. In addition, the Court finds that the relative merits of the parties' position weigh in favor of awarding attorneys' fees. Also, the Court notes that the awarding of attorneys' fees would undoubtedly have a deterrent effect upon the future conduct of Trustees of other funds. With regard to the financial ability of the offending party to satisfy an award of attorneys' fees, the Court again notes that the record is silent as to the present financial stability of CAAIG. Further, the Fund was apparently financially able to repay the plaintiffs' in September

1992. More importantly, even if CAAIG's financial condition is unstable, the Court is of the view that to deny the plaintiffs' request for attorneys' fees would be tantamount to rewarding the defendants for depleting the funds of the segregated contributions made by the plaintiffs who requested the return of the funds approximately eight years ago.

Because of the district court's familiarity with the quality of the representation and the extent of the litigation, the decision whether to award fees and the amount of fees awarded are issues generally confined to the sound discretion of the court. *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir.1998). The well-known formula for calculating attorneys' fees is the "lodestar" method described in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Under this method, the Court makes an initial calculation of a lodestar amount by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763–64 (2d Cir.1998); *Gierlinger*, 160 F.3d at 876; *Luciano v. Olsten Corp.*, 109 F.3d 111 (2d Cir.1997).

If the court finds that certain claimed hours are excessive, redundant, or otherwise unnecessary, the court should exclude those hours from its lodestar calculation. *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933; *Luciano*, 109 F.3d at 116. Once the initial lodestar calculation is made, the court should then consider whether upward or downward adjustments are warranted by factors such as the extent of success in the litigation and the degree of risk associated with the claim. *Hensley*, 461 U.S. at 434 and n. 9, 103 S.Ct. 1933, (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 [5th Cir.1974] ).

 In making the initial lodestar calculation, the Court finds that the hourly rates requested by the plaintiffs are excessive. The rate to be used in the calculation must be the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Luciano*, 109 F.3d at 111, (citing *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 [1984] ). The Court notes that the Second Circuit has recently upheld this Court's rates of $200 per hour for partners, $135 per hour for associates, and $50 per hour for paralegals. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir.1998); *see also Luciano*, 109 F.3d at 111–112 (collecting cases); *Walz v. Town of Smithtown*, 46 F.3d 162 (2d Cir.1995); *Cruz v. Local Union No. 3, Int'l. Brotherhood of Electrical Workers*, 34 F.3d 1148, 1160 (2d Cir.1994); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir.1994). In addition, travel time should be reduced by 50% of the billable rate. *Luciano*, 925 F.Supp. at 965, aff'd, *Luciano v. Olsten Corp.*, 109 F.3d 111 (2d Cir.1997); *Cruz*, 34 F.3d at 1161 (citing *Jennette v. City of New York*, 800 F.Supp. 1165, 1170 [S.D.N.Y.1992] ).

The plaintiffs' hourly rates consist of Alexander A. Miuccio, Esq., $250 per hour and $125 per hour for travel time; Barry L. Mendelson, Esq., $150 per hour and $75 per hour for travel time; Gary Wirth, Esq., $150 per hour and $75 per hour for travel time; and Robert Wasko, Esq., $150 per hour and $75 per hour for travel time. The hourly rates requested by the plaintiffs are modified as follows: Alexander A. Miuccio, Esq., $200 per hour and $100 per hour for travel time; Barry L. Mendelson, Esq., $135 per hour and $65 per hour for travel time; Gary Wirth, Esq., $135 per hour and $65 per hour for travel time; and Robert Wasko, Esq., $135 per hour and $65 per hour for travel time. Based upon these applicable rates, the total amount of attorneys' fees is the sum of $151,375.

 Finally, the Court notes that the plaintiffs' request for computer legal research in the sum of $5054.06 is denied. *See U.S. for the Use and Benefit of Ever-*

green Pipeline Const. Co., Inc. v. Merritt Meridian Construction Corp., 95 F.3d 153, 173 (2d Cir.1996) (holding that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost.") Id. (citation omitted).

## IV. CONCLUSION

Accordingly, it is hereby

**ORDERED,** that the plaintiffs' motion for reconsideration is **GRANTED** and the Court's March 3, 2000 Order is hereby amended so that the defendants are directed to return to Head Start the sum of $497,736 plus prejudgment interest from September 1, 1992, at the United States Treasury Bill Rate, to be calculated by the Clerk of the Court; and it is further

**ORDERED,** that the judgment shall include attorneys' fees in the sum of $151,-375 and costs in the sum of $22,448.78.

**ORDERED,** that the defendants' motion for reconsideration on the issue of CAAIG's financial stability is **DENIED;** and it is further

**SO ORDERED.**